Albert Garza CASTRO, Appellant,

v.

The STATE of Texas, Appellee.

No. 56988.

Court of Criminal Appeals of Texas, En Banc.

Feb. 22, 1978.

Bruce Robertson, Jr., San Antonio, for appellant.

Bill M. White, Dist. Atty., John G. Yates, G. E. Wilcox and Roy R. Barrera, Jr., Asst. Dist. Attys., San Antonio, for the State.

## OPINION

W. C. DAVIS, Judge.

This is an appeal from a conviction for capital murder. On February 25, 1975, the jury answered "Yes" to the special issues submitted under Article 37.071, Vernon's Ann.C.C.P. and the punishment was assessed at death.

In his eighteenth ground of error, appellant contends that the trial court erred in refusing to permit him to impeach John David Rhoades, a State's witness, for bias and motive for testifying favorably to the State.

The sufficiency of the evidence to show appellant's guilt for the murder and robbery of Eugene Fish is not challenged. However, in light of our holding, a detailed statement of the facts is necessary. Robert Jolley testified that the deceased was the manager of the Seat Cover, Inc., a southside clothing store in San Antonio. Jolley, the deceased's roommate, last saw the deceased alive on the evening of May 22, 1974. Vidal Balderas, an employee of the Seat Cover, Inc., arrived at the store around noon on May 23, 1974 and found it closed. He used his key to enter the store, and found the deceased in a pool of blood in the back storeroom. Balderas ran to the store next door and got Brent West, who administered first aid to the deceased. During this time the police and an ambulance were called to the scene. The deceased died later that afternoon.

Dr. Ruben Santos, Bexar County medical examiner, testified that the deceased had three gunshot wounds to the head. He also stated that there had been three blows to the deceased's head, made by a blunt instrument, which caused parts of the brain and bone to protrude. He testified that only one of the gunshot wounds but any of the depressed fractures could have singly caused death. Santos also found an abrasion on the chest which pierced the skin and appeared to have been made by a screwdriver.

William Moritz testified that he, John Rhoades and appellant had been roommates for several weeks. Moritz stated that on May 22, 1974, appellant left their apartment at about 9:00 p. m., with the expressed intention of "going out and rolling a queer." Appellant had also displayed a pistol, which he took with him when he left the apartment. On the morning of May 23,

1974, Moritz found new clothes with the tags still on them and stereo equipment in the apartment. These items were later identified as having been stolen from the deceased's store. That evening, after apparently hearing a news report in which they learned that a murder had been committed in connection with the robbery, Moritz and Rhoades called the police who retrieved the stolen articles from the apartment.

The evidence then showed that appellant was arrested in Frio County where he had driven in the deceased's car. He was subsequently returned to San Antonio where he made a confession.

In his confession, appellant admitted that on the night of May 22, 1974, he went downtown to Travis Park to the "Meat Rack", a well-known meeting place for homosexuals. There he met "Blue Boy" (later identified as Ronnie Proctor), an acquaintance. At around 1:00 a. m., the deceased drove by in his car, and the three agreed that if appellant and "Blue Boy" would show the deceased "what they had", or expose their genitals to him, he would give them clothes. The three men then drove to the deceased's store.

Once at the store, appellant stated that he and "Blue Boy" showed the deceased their penises. He stated that the deceased then told them to pick out some clothes from the store, and began talking about engaging in sexual activity with them. Appellant stated that while he was picking out clothes he heard a shot and a scream and saw that the deceased had been shot in the head by "Blue Boy" who had appellant's gun. "Blue Boy" then shot the deceased in the head two more times from close range. Appellant stated that he then picked up a hammer and beat the deceased in the head several times. He later picked up a screwdriver and "poked" the deceased in the chest to see if he was still alive. Appellant then took the deceased's personal effects, and he and "Blue Boy" left the store, taking "quite a bit of clothes." He drove "Blue Boy" back downtown, and then returned to the store where he took more

clothes and a stereo. Appellant stated that he beat the deceased in the head with the hammer because he was afraid of "Blue Boy" and was scared that "Blue Boy" would shoot him.

John Rhoades, a witness for the State, testified that on the night of May 22, 1974 appellant told him that he was desperate for money and was "going to go out and roll a queer." Rhoades stated that appellant had a gun, and asked Rhoades to go with him as a decoy. Rhoades first agreed to go but later changed his mind. He stated that appellant threatened to shoot him when he refused to go. Rhoades testified that before appellant left the apartment appellant said that "he was going to kill the queer if the queer could identify him." He stated that the next morning when appellant was showing him the stolen property appellant told him that he had made six trips back into the store to collect the property and wipe off his fingerprints. Rhoades stated that he took some of the stolen property for his own use and sold some of it, planning to buy marihuana.

Rhoades testified that after he and Moritz called the police on the evening of May 23rd he attempted to leave town because he did not want to become involved in the questioning since he was on probation for a felony offense in Dallas.

Rhoades stated that he was arrested at the bus station and was taken to the police station where he told what he knew about the offense. He further stated that he then spent three months in jail.

At this point, during his cross-examination of Rhoades, appellant asked the witness what he had been charged with when he was arrested at the bus station. The State objected to this question; the objection was sustained and Rhoades did not answer. Appellant requested the opportunity to develop a bill of exception, which the trial court stated appellant could do later out of the presence of the jury.

Appellant continued his cross-examination of Rhoades, and a few minutes later asked:

"Now, isn't it a fact that you were charged with aggrevated (sic) robbery with a deadly weapon?"

The State again objected, which objection was sustained and Rhoades did not answer the question.

Rhoades also testified that he had seen appellant once in jail and that appellant had threatened to kill him if released on bail, because Rhoades had "snitched" on him.

Later during the trial, appellant perfected his bill of exception and the following testimony was elicited:

"Q. [Appellant's counsel] . . . I think you testified that you were arrested at a bus station shortly after Mr. Castro returned to the apartments early in the morning of May the 23rd, 1974?

"A. [Rhoades] Yes, sir.

"Q. Within a day or two, you were arrested?

"A. Yes, sir.

"Q. Now, at that time, what were you arrested for, sir?

"A. Well, they took me down to the police station and told me that I was charged with murder and aggrevated (sic) robbery.

"Q. Okay. Who told you that?

"A. A Sergeant Bill Weilbacher.

"Q. Did he tell you that it was in connection with this offense here?

"A. Yes, sir.

"Q. Now, those charges are not pending against you any more?

"A. No, sir; they never were.

"Q. What do you mean they never were? What do you mean?

"A. They weren't on record over there at the county jail.

"Q. Well, you were put in jail, weren't you?

"A. Uh-huh.

"Q. And, was there a complaint filed against you?

"A. No.

"Q. But you were told by Sergeant Weilbacher of the San Antonio Po-

lice Department that you were charged with murder and aggrevated (sic) robbery?

"A. Yes, sir.

"Q. But you are now not charged with that, are you, and that is why you are here testifying for the State?

"A. No, sir.

 *   *   *   *   *   *

"Q. [Prosecution] Whatever Mr. Weilbacher told you, no complaint was filed against you to your knowledge, charging you with the offense of murder, is that what your testimony is?

"A. Yes, sir.

"Q. And to your knowledge the only offense you were charged with by the Grand Jury was theft over the value of $200.00?

"A. Yes, sir.

"Q. The only other felony conviction that you have had is the one you testified to here previously here before the Jury, the one you are on probation for now, is the one out of Dallas County?

"A. Yes, sir.

"Q. [Defense counsel] Mr. Rhoades, these charges that you were taken before the Grand Jury, was that theft over the value of $200.00?

"A. Yes, sir.

"Q. And did that arise out of these proceedings and the things that Albert Castro brought into the apartment?

"A. Yes, sir.

"Q. And those charges no longer exist?

"A. Yes, sir."

At the end of the hearing, appellant, by a proper objection, renewed his exception to the trial court's refusal to allow the jury to hear this evidence. However, the court refused to admit the evidence.

Appellant did not testify in his own behalf, nor did he present any evidence at either stage of the bifurcated trial.

Appellant now contends that the trial court erred in refusing to allow the jury to

hear the evidence adduced in the bill of exception as impeachment of Rhoades for bias and motive in testifying for the State. We agree with this contention.

In *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court held that a defendant was denied the right of effective cross-examination where the trial court limited his cross-examination of the State's witness as to bias or motive due to his status as a juvenile probationer. The court, relying upon the Sixth Amendment right to confrontation of witnesses, held this to be error of constitutional dimension.

As this Court has stated many times, great latitude should be allowed a defendant in showing *any* fact which would tend to establish ill feelings, bias, motive and animus upon the part of any witness testifying against him. *Jackson v. State,* 552 S.W.2d 798 (Tex.Cr.App.1977); *Robinson v. State,* 550 S.W.2d 54 (Tex.Cr.App. 1977); *Simmons v. State,* 548 S.W.2d 386 (Tex.Cr.App.1977); *Evans v. State,* 519 S.W.2d 868 (Tex.Cr.App.1975); *Smith v. State,* 516 S.W.2d 415 (Tex.Cr.App.1974); *Blair v. State,* 511 S.W.2d 277 (Tex.Cr.App. 1974).

In *Blair v. State,* supra, we stated that any possible malice, bias or prejudice towards the defendant on the part of the witness is admissible to attack his credibility and to lay the groundwork for possible impeachment. The motives which operate on the mind of a witness when he testifies are never regarded as immaterial or collateral matters.[1] The defendant may prove facts "which tend to show bias, interest, prejudice or any other mental state or status which fairly construed might tend to affect his credibility." See 1 Branch's Ann. P.C. 2d Ed. Sec. 185.

In *Evans v. State,* supra, this Court reversed a conviction where the trial court refused to allow the defendant to show that a witness testifying for the State against the defendant was currently under indictment. We held that the claim of bias, interest and motive which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of the witness' vulnerable status as an indictee, as well as of the witness' possible concern that he might be a suspect in the offense.

Then, in *Simmons v. State,* 548 S.W.2d 386 (Tex.Cr.App.1977), we rejected a distinction between the situation where a witness had charges *pending* against him at the time he testified and where the charges against him had apparently been *dismissed* prior to his testifying for the State in another prosecution. We noted that although charges against a witness may have been dismissed, there is always a possibility that the State may cause the charges to be refiled, should the State so choose. Therefore, a defendant has a right to cross-examine a prosecution witness as to charges against him which have been dismissed prior to his testifying in another criminal prosecution, as well as to those charges pending against him at the time he testifies for the State, in attempting to show motive for testifying and bias towards the State.

Also, as this Court stated in *Smith v. State,* 516 S.W.2d 415 (Tex.Cr.App.1974), although "the mere fact of an arrest or indictment of a witness is not normally admissible for impeachment purposes to show bias, motive, ill feelings or animus [footnote omitted], where the evidence of an *arrest* or *legal accusation* arises out of the same transaction for which the defendant is on trial, it may be admissible as such impeachment of the witness."

In the instant case, Rhoades' own testimony clearly implicated himself in some aspect of the offense, since he knew the appellant was going to attempt to commit a robbery on the night of May 22; he originally agreed to assist appellant in committing a robbery; he knew on the morning of May 23 that appellant had committed some crime; he had knowledge that the clothing in the apartment had been stolen; and

1. In its brief, the State fails to distinguish between general impeachment of a witness and impeachment by specific acts for bias and motive in testifying.

knowing that the clothing was stolen, he took it for his own use and disposed of it.

Therefore, appellant sought to bring before the jury evidence that Rhoades had originally been arrested as a participant in the robbery and murder, and that he had been formally charged with an offense arising out of the same transaction for which the appellant was on trial. He further sought to show the jury that none of these charges were pending against Rhoades at the time of appellant's trial.[2] By presenting evidence to the jury that, while Rhoades had participated in some criminal offense and had been arrested for robbery and murder and indicted for theft, but that those charges were no longer pending against him, appellant sought to show that Rhoades had some interest and motive in testifying for the State. The inference that the jury *could* have drawn was that Rhoades had a personal interest in helping the prosecution prove its case against appellant and, therefore, may have been an unreliable witness. While the jury may have chosen to reject such an inference, especially since Rhoades denied that he was testifying for the State because of his vulnerable status, this evidence was nevertheless admissible and appellant should have been permitted to prove these facts. See *Davis v. Alaska,* supra; *Simmons v. State,* supra; *Robinson v. State,* supra; *Evans v. State,* supra; *Blair v. State,* supra; *Burkhalter v. State,* 493 S.W.2d 214 (Tex.Cr.App.1973).

This is not the case where the defendant made no attempt to show that the charges were being used to force the witness' testimony or that he expected favorable treatment in his own case because of his testimony. See *Garza v. State,* 532 S.W.2d 624 (Tex.Cr.App.1976). Nor is this the case where the defense was able to introduce much of the testimony tending to show possible prejudice and motive on the witness' part, anyway, in spite of the trial court's ruling. See *Jackson v. State,* 552 S.W.2d 798 (Tex.Cr.App.1977). Nor is this

the case where the witness was an unimportant witness in the case or where his testimony contributed no vital information that was not already before the jury. See *Mutscher v. State,* 514 S.W.2d 905 (Tex.Cr. App.1974).

We cannot conclude that this error was harmless. It is clear that the evidence of appellant's guilt of the offense is overwhelming. However, in a capital murder case, after a finding of guilt, the jury must answer the special issues under Article 37.-071, Vernon's Ann.C.C.P., in order to determine the punishment. The jury must, among other things, determine whether there is a probability that the defendant would subsequently commit criminal acts of violence that would constitute a continuing threat to society.

In the instant case, neither the State nor the defense presented *any* evidence at the hearing on punishment. Therefore, in answering the special issues, the jury had to base its answer to this question upon the evidence heard at the guilt or innocence phase of the trial. In reviewing the evidence presented by Rhoades alone, it is clear that his testimony may have been crucial to the jury in answering the special issues. Rhoades corroborated Moritz's testimony that appellant went out on the night of May 22 armed and with the express intent of "rolling a queer." Rhoades, alone, testified that appellant threatened to kill him when he decided against assisting him in committing the crime. Rhoades alone testified that appellant said that he would "kill the queer if the queer could identify him." He also testified that appellant made six trips back to the deceased's store, apparently while the deceased lay dying in the back room. Rhoades also testified that appellant threatened to kill him since he "snitched."

This evidence, with the circumstances of the crime itself, must be contrasted with the evidence that appellant was nineteen years old at the time of the offense, and

---

2. It is apparent from the testimony that there had been no final disposition of the charges; Rhoades testified that he had only one prior

felony conviction at the time of appellant's trial.

there was no evidence that he had a prior criminal record. Appellant also stated in his confession that during the murder he acted out of fear of "Blue Boy."

Since the evidence adduced at trial formed the basis for the jury's answer to the special issue on appellant's propensity to commit future acts of violence and since Rhoades' testimony was very damaging to appellant, we cannot conclude that the trial court's exclusion of the impeachment evidence was harmless error. There was little other evidence bearing on this special issue besides appellant's confession and Rhoades' testimony. Therefore, we cannot conclude that the trial court's refusal to allow appellant to impeach Rhoades for bias and motive was harmless to appellant.

In view of our disposition of the appeal, it is not necessary that we consider appellant's remaining grounds of error. However, appellant raises two issues, which, in the event of retrial, may arise again. Therefore, we answer these grounds of error.

In his sixteenth and seventeenth grounds of error, appellant challenges the admissibility of his confession. He contends that he did not waive his right to counsel before making the confession, which rendered it inadmissible.

A hearing was held on appellant's motion to suppress, after which the trial court filed findings of fact and conclusions of law. The trial court found that when appellant was arrested in Frio County he was taken before a magistrate and warned of his rights; that he was served with an arrest warrant and returned to San Antonio shortly thereafter; that upon arriving in San Antonio he was again warned of his rights; that he knowingly, intelligently and voluntarily waived his rights, including the right to an attorney; that he was not threatened, coerced or intimidated before making the statement.

■ We have reviewed the testimony taken in the hearing on the motion to suppress and at trial and conclude that the evidence supports the trial court's findings.

A waiver of the right against self-incrimination and the right to counsel is determined from the totality of the circumstances. *Estes v. State,* 507 S.W.2d 216 (Tex.Cr.App.1974); *Hughes v. State,* 506 S.W.2d 625 (Tex.Cr.App.1974); *Walker v. State,* 501 S.W.2d 912 (Tex.Cr.App.1973). The fact that appellant did not *specifically* state that he waived his right to counsel does not prevent the trial court from finding that appellant knowingly, intelligently and voluntarily did so. *Moreno v. State,* 511 S.W.2d 273 (Tex.Cr.App.1974), cert. den. 419 U.S. 1115, 95 S.Ct. 794, 42 L.Ed.2d 813 (1975); *Thomas v. State,* 458 S.W.2d 817 (Tex.Cr.App.1970); *Easley v. State,* 448 S.W.2d 490 (Tex.Cr.App.1970). Since the evidence supports the trial court's findings, these grounds of error are overruled.

■ In his twenty-ninth ground of error, appellant contends that the State withheld exculpatory and mitigating evidence from the defense in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant filed a motion in the trial court requesting to inspect the District Attorney's file in this case. The trial court denied this motion and, instead, made its own review of the file and determined that there was no exculpatory or mitigating evidence in the file which should be released to appellant. The file was transmitted to this Court in a sealed record, as a part of the record on appeal. We have carefully reviewed all of the reports and statements contained therein and conclude that the trial court was correct in its ruling; the District Attorney's file contains no evidence favorable to appellant on the issue of guilt or in mitigation of punishment. This ground of error is overruled.

The judgment is reversed and the cause remanded.