**Linda Mae BURNETT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 4–83–00520–CR.**

Court of Appeals of Texas, San Antonio.

July 6, 1988.

**440**

Charles D. Carver, Port Arthur, Mark Stevens, San Antonio, Margaret Covington, Houston, for appellant.

James S. McGrath, Criminal Dist. Atty., Beaumont, for appellee.

Before CADENA, C.J., and REEVES and DIAL, JJ.

## OPINION

CADENA, Chief Justice.

Appellant was found guilty of the capital murder of Martha Jean Phillips and sentenced to life imprisonment.

On July 1, 1978, Elmer Phillips and his wife, Martha Jean, accompanied by their small child, Jason, were visiting Elmer's parents, Bishop and Esther Viola Phillips at the parents' home in Winnie, Chambers County, Texas. George Phillips, who lived with his parents, Bishop and Esther Viola, left for Houston that afternoon, and when he returned on July 3, no one was at home.

He saw blood on the floor and on the kitchen door. The screen on the front door had been cut and Elmer's car was gone. He called the authorities, and an investigation was begun.

On July 3, 1978, Joe Dugas went to the home of his brother, Richard, to give Richard $40.00 in exchange for a .22 caliber rifle which he had previously borrowed from Richard and was unable to return because he had to "get rid" of it.

On July 4, Joe told Richard and Roy Dugas that he thought he had committed the perfect murder, describing in detail how he and a woman had prepared an alibi based on an alleged trip to the beach. They had left his car at a predetermined site and had driven the woman's car to a point near the Phillips home where, according to Joe's account, they had changed into jungle fatigues and crawled to the Phillips residence. They then cut the screen on the front door and entered the house, surprising the members of the Phillips family, including Martha Jean, and tied them with a rope. When Bishop Phillips tried to escape Joe Dugas hit him in the mouth with a .45 caliber pistol, causing much bleeding. They forced the family into Elmer's car, which Joe drove to a pre-dug grave. After the Phillips family had been forced to their knees in the grave, the woman shot the four adult members of the family and Joe shot the child, Jason. Joe also told Roy and Richard that the victims had been killed with the rifle he had borrowed from Richard, which he later disassembled, throwing the parts into various canals. Joe then asked Richard and Roy to help him kill the woman's husband, promising to share the insurance proceeds with them.

Richard did not believe Joe's story at the time, but when he learned, on July 6, that the Phillips family had disappeared, he told the police of the story Joe had told him, and on July 8 he gave a statement to the Jefferson County Sheriff's Department.

Charles Neel testified as follows:

1. In late May of 1978, prior to the event summarized in preceding portions of this opinion, he met with Joe Dugas and appellant in the parking lot of the Rodair

Club, where Joe introduced Neel to appellant, telling Neel that appellant was going to help him, Joe, kill his in-laws, the Phillips family.

2. Appellant said, "Yeah and you [Joe] are going to help me kill my ex-old man." She told Neel that she wanted her former husband, Hubert Miller, killed so she could receive social security benefits for her children, and that she would give the proceeds of a $50,000.00 insurance policy on Miller's life to any person who would kill him.

3. Neel told Joe that he and appellant were crazy and would end up in jail for even thinking about "something like that."

On July 6, 1978, Neel told Captain Shaw of the Jefferson County Sheriff's Department that the Phillips family from Winnie had been killed and that Joe Dugas and appellant had asked Neel to help kill them. On July 7, 1978, warrants were obtained for the arrest of Joe Dugas on charges of kidnapping. Chambers County officers, F.B.I. agents and officers from various other agencies were present during the late afternoon arrest.

Joe Dugas told F.B.I. agent Harvell that he and appellant had been on the beach during the late evening hours of July 1 and had gone to the Rodair Club about 1:00. He left the club and met appellant at his home, where they stayed until appellant went to her home at about 2:30 A.M.

In the evening of July 7, Harvell, Shaw and three F.B.I. agents went to appellant's home. She became distraught when asked about the missing Phillips family, but she calmed down after taking some medication. After two of the officers had taken her husband to another area of the house, Harvell questioned her in the presence of Shaw and Special Agent Smith. After she told Harvell the beach alibi story, she was taken to the police station to give a written statement.

Shaw took appellant's written statement for the purpose of using it during a lie detector test which appellant had agreed to take. However, after a telephone conversation with her husband, she refused to take the test, saying she would take the

test the next day. She was then taken home.

The next day appellant appeared at the police station with her husband but left after telling the officers she had decided not to take the test.

On July 9, Joe Dugas led officers to the camouflaged gravesite, and recovery of the bodies continued for several hours. A warrant for appellant's arrest was obtained sometime after midnight, and appellant was arrested at her home. She was advised of her rights and indicated she understood them. As she was being transported to the county jail, she said she wanted to give a statement. A second written statement, was taken from appellant. A portion of this statement, State's Exhibit No. 13–C, was admitted at trial.

In her first and second points of error appellant claims the evidence of her oral and written statements made on July 7, 1978, were improperly admitted because they were obtained as the result of custodial interrogation in violation of Amendments IV, VI and XIV of the Federal Constitution and Article I, § 10 of the Texas Constitution and Article 38.22 of the Texas Code of Criminal Procedure.

Special Agent Harvell testified that he conducted the interview with appellant at her home. He testified that appellant was not under arrest nor restrained in any manner. Appellant could have terminated the interview at any time had she desired. Harvell said that appellant was very cooperative and voluntarily submitted to the interview. Harvell stated that appellant voluntarily agreed to accompany them to the police station, give a written statement and then take a polygraph test.

Captain Shaw testified that appellant voluntarily accompanied the officers to the police station following the interview at her home. Capt. Shaw stated that appellant was not under arrest and would have been free to leave at any time. He said appellant voluntarily gave the statement, State's Exhibit No. 9–A. Shaw described appellant's attitude as very cooperative in giving the statement.

Both Shaw and Harvell testified that *Miranda*[1] warnings were not given to appellant and that she never requested a lawyer. Both men considered appellant a potential witness. The testimony of Shaw and Harvell was basically supported by the testimony of Special Agent Crispin Smith and Deputy Sheriff Jay White.

At the hearing on the motion to suppress, appellant testified that officers who interviewed her at home told her that she was a suspect. She felt like a prisoner and twice requested a lawyer, but the officers told her she did not need one. When the officers told her she had to go to the police station, she again unsuccessfully asked for an attorney.

 The determination of whether a statement is voluntary must be based upon an examination of the circumstances surrounding its acquisition. *See Barney v. State*, 698 S.W.2d 114 (Tex.Crim.App.1985). The trial judge at the *Jackson v. Denno*[2] hearing is the sole judge of the weight and credibility of the witnesses. *Id.*

 There is sufficient evidence to support the trial court's findings that appellant's statements, both oral and written, were voluntarily given and not the result of custodial interrogation.

Custodial interrogation occurs only when the interrogation is initiated by enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). The fact that the questioning takes place in a police station or that the questioned person is one whom the police suspect is irrelevant unless there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).

The fact that appellant voluntarily went to the station and was free to leave is evidenced by the fact that she was returned to her home by the officers. Appellant's claim that she was in fact a suspect at a time when the investigation was focusing on her is irrelevant. In *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the Supreme Court rejected the notion that the "in custody" requirement of *Miranda* is satisfied whenever the police interview a person who was the "focus" of a criminal investigation.

The evidence supports the conclusion that appellant's oral and written statements of July 7th were freely and voluntarily made and were not the result of custodial interrogation so that their admission into evidence was proper. *Cf. Beheler, supra; Beckwith, supra; Turner v. State*, 685 S.W.2d 38 (Tex.Crim.App.1985); *Clark v. State*, 627 S.W.2d 693 (Tex.Crim.App.1982); and *Jones v. State*, 522 S.W.2d 470 (Tex.Crim.App.1975). The admission of appellant's July 10, 1978 statement (State's Exhibit 13–C) was not error, since it was not the fruit of an illegal arrest.

Appellant was arrested at her home around 2:00 A.M., July 10, 1978. She was handcuffed and placed in the back seat of a police car. Sitting beside her was Officer Jay White, who read her her rights. Captain Shaw and Lt. Brown were in the front seat.

Immediately prior to obtaining the arrest warrant all three officers had been involved with the recovery of the bodies at the gravesite. The odor of decomposing flesh so strongly permeated the interior of the car that appellant tried to cover her nose with her hands. Captain Shaw told appellant that the odor came from the fact the officers had been recovering the bodies from the gravesite. Appellant began crying and said she wanted to give a statement. The officers then took her to the closest sheriff's department substation, in-

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

stead of the county jail as they had originally planned. Appellant, after being told of her rights again, placed her initials by each right listed on the statement form. Officer White began taking appellant's statement at about 2:20 A.M. and completed it around 4:30 A.M.

The officers testified that appellant voluntarily gave the statement and that no threats, force, or other inducements were used to obtain it.

Appellant testified, at the hearing on the motion to suppress, that she told the officers she wanted to call her husband and wanted an attorney, but they refused her requests. She said that she considered remarks made to her by D.A. Investigator Blanchard as a threat to her life if she didn't cooperate and give a statement. Appellant said that Officer White told her that if she gave a statement she, appellant, would then be taken home. She said that the foul odor of death from the officers clothes also permeated the small office in which the statement was taken. She stated she did not voluntarily give the statement. On cross-examination, appellant admitted that one reason she gave the statement was to prove that she did not harm or kill anyone. While asserting that she told the truth in the statement, appellant refused to identify the signature on the statement as hers.

The officers denied the appellant's specific allegations that she requested to call her husband, requested to call an attorney, or that they threatened her or promised to release her upon her giving a statement.

Captain Shaw's affidavit setting out the facts upon which the magistrate issued the arrest warrant stated that the Phillips family had been reported missing and that the facts surrounding their disappearance indicated foul play was involved. He stated that Elmer Phillips' car had been found in Jefferson County. Shaw also reported that Joe Dugas had been arrested on a warrant issued in Chambers County and charged with aggravated kidnapping. Dugas denied his guilt and told police he had been at the beach with appellant Saturday until early Sunday morning.

Shaw then related that he had taken appellant's statement concerning her activities on July 1, 1978, and she swore that she had been at the beach with Joe Dugas. However, Shaw said that Joe Dugas later gave an oral confession that led to the recovery of five bodies in a shallow grave in Jefferson County. Shaw explained that he learned that Joe Dugas told one of his brothers that he was with a white female when he kidnapped and killed the Phillips family. Shaw concluded that the above information constituted sufficient probable cause to issue a warrant charging appellant with capital murder.

 An affidavit in support of either a search or arrest warrant must provide the magistrate with sufficient information to support an independent judgment that probable cause exists for the issuance of the warrant. *Jones v. State*, 568 S.W.2d 847 (Tex.Crim.App.), *cert. denied*, 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 352 (1978). The facts stated in the affidavit must go beyond mere suspicion on the part of the affiant. *Pinkston v. State*, 681 S.W.2d 893 (Tex.App.—Fort Worth 1984, pet. ref'd). Absent allegations of deliberate falsehood or reckless disregard for the truth, the determination of the sufficiency of the affidavit is made upon examining the information contained within the four corners of the document. *See Ramsey v. State*, 579 S.W.2d 920 (Tex.Crim.App.1979). The sufficiency of the affidavit is examined under the "totality of the circumstances" analysis established in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *See Hennessy v. State*, 660 S.W.2d 87 (Tex. Crim.App.1983).

 An examination of the affidavit for the arrest warrant in the instant case reveals that it fails to establish probable cause. There are no facts in the affidavit which connect appellant with the offense beyond mere suspicion. There is nothing in the affidavit which indicates when the Phillips family was killed so as to make relevant the fact that appellant and Joe Dugas each stated they were together during the evening of July 1, 1978, and early morning hours of July 2, 1978. Nor is the

fact that the family was reported missing at 12:30 A.M. on July 2, 1978, relevant without knowing the last time they were seen alive. We also note that the July 2 date is incorrect. George Phillips testified that he reported the family missing at 12:30 A.M. on July 3, 1978. The white female in the eighth paragraph of the affidavit is not named. The conclusion that appellant is the unnamed white female referred to in the affidavit is not supported by the facts recited in the affidavit. The affidavit fails to establish probable cause for the issuance of the arrest warrant.

There is no evidence in the record which supports appellant's arrest without a warrant under TEX.CODE CRIM.PROC.ANN. art. 14.01 (Vernon 1977) *et seq.* Appellant's arrest was unlawful.

The question remains whether the connection between appellant's unauthorized arrest and her statement obtained during her illegal detention was sufficiently attenuated to permit its introduction into evidence. *See Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York,* 442 U.S. 220, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

The court found that appellant's rights were explained to her as required by TEX. CODE CRIM.PROC.ANN. art. 38.22, § 2(a) (Vernon 1979). *See Miranda, supra.* The court found that appellant understood her rights and knowingly, intelligently, and voluntarily waived those rights and that the statement was voluntary and was not the result of any threats or coercion.

■ Because the trial court is the sole trier of fact at the hearing on the motion to suppress, this Court cannot disturb any finding which is supported by the record. *See Green v. State,* 615 S.W.2d 700 (Tex. Crim.App.1980), *cert. denied,* 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981). Since no Fifth Amendment or art. 38.22 violations have been shown, we defer to those determinations.

■ During the trial the court, after conducting an additional hearing outside the presence of the jury, found that in the event the affidavit for arrest did not establish probable cause, the evidence showed that probable cause did in fact exist, separate and apart from the information alleged in the affidavit, and that the police were not engaged in flagrant conduct in the taking of the statement.

The record reveals that the police did have probable cause for appellant's arrest. One important fact omitted from the Shaw affidavit was that Charles Neel had told Shaw that appellant and Joe Dugas had previously solicited his assistance to kill the Phillips family. Neel also told Shaw that the family was already dead. The affidavit also failed to show that Richard Dugas had told the officers that the unnamed woman who assisted Joe Dugas with the actual killing would give the beach alibi for Joe Dugas. These important factors added to what the officers already knew and had stated in the affidavit were sufficient to establish probable cause for appellant's arrest. Since the officers did in fact have probable cause for appellant's arrest at the time it was effected, no Fourth amendment violation occurred.

■ Although no federal constitutional violations have been shown, since the warrant was invalid and appellant's arrest not in compliance with TEX.CODE CRIM. PROC.ANN. ch. 14 (Vernon 1977), we must determine whether appellant's statement was the fruit of her illegal arrest under Texas law and should be excluded under TEX.CODE CRIM.PROC.ANN. art. 38.23 (Vernon Supp.1988), which provides in part: "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas ... shall be admitted in evidence against the accused on the trial of any criminal case."

The analysis to be used to determine whether appellant's statement was the product of her illegal arrest under Texas law is the same analysis used in *Brown, supra. See Self v. State,* 709 S.W.2d 662 (Tex.Crim.App.1986) and *Bell v. State,* 724 S.W.2d 780 (Tex.Crim.App.1986). This analysis requires us to consider the follow-

ing factors to determine whether a statement given following an illegal arrest is sufficiently attenuated to permit its use in evidence at the accused's trial:

(1) whether *Miranda* warnings were given;

(2) the temporal proximity of the arrest and the confession;

(3) the presence of intervening circumstances; and

(4) the purpose and flagrancy of the official misconduct.

*Self,* 709 S.W.2d at 666, and cases cited therein.

 As previously noted, we agree that appellant was properly given her *Miranda* warnings, understood her rights and knowingly, intelligently and voluntarily waived those rights.

The temporal proximity between the time of arrest and the conclusion of the written statement is approximately two hours. This factor is in appellant's favor on the question of taint.

The third factor also favors appellant as there were no intervening circumstances.

The fourth factor, the purpose and flagrancy of the official misconduct, may be the most important factor to be considered in light of the deterrent purposes of the exclusionary rules of the Fourth Amendment and art. 38.23. *See Self,* 709 S.W.2d at 667, 668. Unlike the situations in *Brown, supra; Dunaway, supra; Taylor, supra;* and *Green, supra;* the police in the instant case had probable cause to arrest appellant. The officers left the gravesite and went to Judge Cravey's office and applied for a warrant, although we have concluded the affidavit does not establish probable cause. The officers testified that they were tired from working at the gravesite and had not intended to question appellant after her arrest, but had intended to take appellant to the county jail in Beaumont, less than an hour's drive from her home. After appellant stated she wanted to tell her side of the story, the officers contacted a member of the District Attorney's staff who instructed them to go to the nearest police substation. The conduct of the police cannot be said to have been purposeful-

ly illegal. Nor does the action resemble the type of expedition for evidence condemned in *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262, *Dunaway,* 442 U.S. at 218, 99 S.Ct. at 2259, and *Taylor,* 457 U.S. at 693, 102 S.Ct. at 2668. The odor of the gravesite on the officers clothes as a result of having worked at the recovery area does not appear from the evidence in the record to have been a malicious, deliberate psychological tool used to try to break appellant's silence. Even appellant's testimony on the motion to suppress does not indicate that this influenced her in any way or effected her at all. The evidence also supports the trial court's finding that appellant was not mistreated, threatened or coerced.

The evidence, when viewed in its entirety, reveals a good faith effort by the officers to comply with both Texas and federal law. *Cf. United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). There was probable cause to arrest, and *Miranda* warnings were repeatedly given appellant. Although the statement was taken within two hours of the arrest and there were no intervening circumstances, we conclude that the taint of the illegal arrest was overcome.

 Appellant's fourth point of error alleges the trial court erred in overruling appellant's hearsay objection to the testimony of Calise Blanchard.

D.A. Investigator Calise Blanchard testified that he interviewed Joe Dugas on July 9, 1978, while Dugas was in custody. As a result of this interview, Blanchard, Joe Dugas and three police officers went to a remote area in Jefferson County known as Gilbert Woods. They stopped their vehicle at the 12 mile marker and followed Joe Dugas on foot into the woods. Over appellant's hearsay objection, Blanchard testified that Joe Dugas reached a point in the woods and stopped, then reversed direction and walked along a path with Blanchard following. Dugas stopped and stared at an area of ground about fifteen feet in front of him. Upon examination, Blanchard and the officers realized that this was the victims' gravesite.

This testimony was not hearsay as that term has been defined in TEX.R.CRIM. EVID. 801(d), and was admissible. *Cf. Catching v. State,* 364 S.W.2d 691 (Tex. Crim.App.1963) (rule which renders inadmissible acts or admissions of co-conspirator done or made in absence of defendant after conspiracy has been terminated by commission of crime, has no application where it can be shown that co-conspirator was found in possession of fruits of crime or weapon or instrument with which crime was committed).

The fourth point of error is overruled.

▬▬▬ The fifth and sixth points of error allege that the trial court erred in overruling appellant's hearsay objection to the testimony of Richard and Roy Dugas as to their conversation with Joe Dugas on July 4, 1978, wherein Joe Dugas described the circumstances surrounding the commission of the instant offense.

In order to render a hearsay statement admissible under the co-conspirator exception to the hearsay rule, the State must prove that at the time of the statement the alleged co-conspirator was participating in a conspiracy in which the defendant also participated or later joined and that the statement was made during the furtherance of the conspiracy. *Ward v. State,* 657 S.W.2d 133 (Tex.Crim.App.1983).

The evidence showed that appellant and Joe Dugas agreed to help each other kill Dugas' in-laws and appellant's former husband. At the time of the July 4 conversation, appellant and Joe Dugas had not yet used their planned beach trip alibi nor had they killed appellant's former husband. A conspiracy is not finally terminated until everything has been done that was contemplated to be done by the conspirators. *Robins v. State,* 134 Tex.Crim. 617, 117 S.W.2d 82 (1938). Both Richard and Roy testified that during this same conversation, Joe sought their assistance in killing the former husband of the woman who had helped him kill the Phillips family and told them he would share the insurance proceeds with them. This was an attempt by Joe Dugas to have his brothers assist him in the killing of appellant's former hus-

band. Thus, the July 4 conversation was indeed made during the course of and in furtherance of the conspiracy. *Cf.* Judge Dally's dissenting opinion in *Burnett v. State,* 642 S.W.2d 765, 774–75 (Tex.Crim. App.1983). The fifth and sixth points of error are overruled.

In her seventh point of error, appellant alleges that the trial court erred in overruling her motion for a *Jackson v. Denno* hearing requested during the testimony of F.J. Johnson, a witness for the State, and who had been incarcerated with appellant in the Bexar County Jail.

This Court abated the instant appeal and ordered the trial court to conduct a hearing on the voluntariness of appellant's statements to F.J. Johnson, while both were confined in the jail. In ordering this belated *Jackson v. Denno* hearing, we relied on the rationale employed in *Doby v. State,* 681 S.W.2d 759 (Tex.App.—Houston [14th Dist.] 1984, no pet.) and TEX.R.APP.P. 81 as authority for entering such an order. The trial court conducted the hearing and entered the required findings. The record of that hearing and the trial court's findings have been filed in this Court pursuant to our order, and the appeal has been reinstated.

The record of that hearing supports the trial court's findings that appellant's statements to F.J. Johnson were voluntarily made and not the result of custodial interrogation. The evidence also supports the trial court's finding that F.J. Johnson was not an agent of the State when appellant's statements were made. *Cf. Chambliss v. State,* 647 S.W.2d 257 (Tex.Crim.App.1983).

No error on the part of the trial court has been shown. The seventh point of error is overruled.

In the eighth and ninth points of error, appellant alleges the trial court erred in admitting the affidavits of the witness F.J. Johnson and the District Attorney James McGrath at the motion for new trial. Appellant objected on the grounds that the affidavits were hearsay, denied her the right of confrontation and cross-examination and, in effect, would not substitute for

a full *Jackson v. Denno* hearing. These points of error have been rendered moot in light of our disposition of appellant's seventh point of error. The eighth and ninth points of error are overruled.

In the tenth point of error, appellant asserts that the trial court erred in excluding the material testimony of Deborah Landry because this exclusion violated appellant's right to compulsory process.

At appellant's request, the witnesses were placed under the rule. *See* TEX.R. CRIM.EVID. 613. Appellant and the State agreed that appellant's daughter, Deborah Landry, could be excused from the rule and watch the trial. During rebuttal, the State called Karen Burnett Martain. She testified that during the week of July 1, 1978, prior to appellant's arrest, she visited appellant's home to see her father, Leo Burnett. He was not at home, but appellant, Janey, Debbie and Wendy were. Martain testified that Janey took her into one of the bedrooms and showed her newspaper clippings on the missing Phillips family that Janey and appellant were making into a scrapbook.

Shortly after Martain's testimony, counsel for appellant advised the court that the only person available at this time to rebut Martain's testimony was Deborah Landry and requested she be permitted to testify or that a continuance be granted so appellant could fly in another witness who could refute Martain's testimony. The trial court refused. Appellant then perfected a bill of exception in which Deborah Landry testified that Martain's visit occurred after appellant had been arrested for the instant offense. She also testified that the newspaper clippings were kept by appellant at the suggestion of appellant's lawyer, Joe Goodwin. She further testified that she felt Martain resented appellant due to appellant's marriage with Martain's father.

■ The admissibility of testimony of a witness who has violated the rule, or who has not been placed under the rule, is a matter addressed to the discretion of the trial court, and unless an abuse is evident, it will be presumed on appeal that such discretion was properly exercised. *Miller*

*v. State*, 455 S.W.2d 253 (Tex.Crim.App. 1970); *Jasso v. State*, 699 S.W.2d 658 (Tex. App.—San Antonio 1985, no pet.).

■ Appellant conceded at trial that the State had indeed given her Karen Martain's name as a witness prior to trial during the discovery process. Appellant stated that she did not anticipate Karen Martain's testimony. Appellant also noted that Janey had not sat in the courtroom but made no explanation as to why she could not be called to refute Martain's testimony. The trial court was not informed of the name of the other witness that could be flown in nor how this witness' testimony would refute Martain's.

We find no abuse of discretion in the trial court's refusal to allow Deborah Landry to testify. The tenth point of error is overruled.

Appellant's eleventh point of error alleges the trial court erred in overruling appellant's motion for mistrial after the jury had twice indicated it was deadlocked. Such action by the trial court had the effect, according to appellant, of coercing a verdict.

The jury began deliberations on August 12, 1983, at approximately 6:00 P.M. and ended deliberations for that day around 11:00 P.M. On August 13, 1983, deliberations resumed at 8:00 A.M. until a note indicating the jury was deadlocked, 11 to 1 for guilt, was received at 2:10 P.M. Appellant moved for a mistrial on the basis that to instruct the jury to continue deliberations would be to coerce a verdict. The trial court overruled the motion and instructed the jury to continue the deliberations. At approximately 9:58 P.M. on August 13, 1983, the jury sent another note to the court. Both the State and appellant agreed that the jury should retire for the evening, and the note would be considered in the morning. The note showed the jury still deadlocked 11 to 1 for guilt and an expression by the foreman that he did not believe the vote would change with further deliberation. As the jury returned on August 14, 1983, appellant again moved for a mistrial. The jury notified the bailiff that

they wanted to continue for another twenty minutes. The trial court overruled appellant's motion. At approximately 11:30 A.M. on August 14, 1983, the jury returned their verdict.

The length of time that a jury may be held for deliberation rests largely in the discretion of the trial court, and unless it is made to appear that the court abused its discretion in that regard, no error is shown. *Andrade v. State*, 700 S.W.2d 585 (Tex. Crim.App.1985), *cert. denied*, 475 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986); *Byars v. State*, 691 S.W.2d 48 (Tex.App.— San Antonio 1985, no pet.).

Considering the nature of the case, a capital murder case involving eight days of testimony from approximately thirty witnesses, and the time of deliberation, approximately twenty-one and one-half hours, we find no abuse of discretion on the part of the trial court. The eleventh point of error is overruled.

In points of error twelve, thirteen, and fourteen, appellant claims the trial court erred in ordering appellant not to mention the death of their brother, Joe Dugas, to the witnesses, James Lehr, Richard Dugas and Roy Dugas. Appellant asserts that it was necessary to bring out Joe Dugas' death for two reasons: first, to test the bias of these witnesses and their motivation for testifying and to impeach their testimony that Dugas was incapable of acting alone.

The Confrontation Clause of the Sixth Amendment does not prevent a trial judge from imposing limits on defense counsel's inquiry into the potential bias of a prosecution witness. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Trial judges retain wide latitude, insofar as the Confrontation Clause is concerned, to impose reasonable limits on such cross-examination based on concerns such as prejudice, confusion of the issues, the safety of the witnesses or interrogation that is only marginally relevant. *Id.* There is nothing in the record before us to show the relevancy of the particular questions asked James Lehr by appellant and how these questions relate to bias and motive for testifying. In *Koehler v. State*, 679 S.W.2d 6, 9 (Tex.Crim.App.1984) the court stated that in order for a defendant to perfect this type of error for appellate review, he need not show that his cross-examination would have affirmatively established the facts sought, he must only establish the subject matter about which he desired to examine the witness during the cross-examination. Appellant appears to have complied with *Koehler, supra,* by informing the court of the subject matter about which he desired to examine the witnesses' bias and motive for testifying against appellant because they blamed her for their brother's death. Unlike *Koehler,* appellant here perfected a bill of exceptions by cross-examining James Lehr with the questions he desired to ask Lehr. The court granted appellant's request that this was applicable as to the other family members. The bill of exception is as follows:

BY MR. CARVER:

Q: For the record, would you please state your name.

A: James Lehr.

Q: You are the same Mr. Lehr that testified previously today?

A: Yes, sir.

Q: Mr. Lehr, I believe you've testified that Joe Dugas was your stepbrother.

A: Yes, sir.

Q: And, Mr. Lehr, can you tell us if you are aware of the fact that Joe Dugas was shot and killed?

A: Yes, sir.

Q: Are you aware of the circumstances under which he was killed?

A: Yes, sir.

Q: To your knowledge, was he killed in trying to escape in route back to Huntsville?

A: Excuse me?

Q: To your knowledge, are other members of the Dugas family also aware of this event?

A: I would assume that, yes, sir.

Even if we assume that appellant would have established that the three brothers were aware that Joe Dugas was shot and killed while trying to escape in route back

to Huntsville, these facts, as they stand, bear no relation to any definite point in time; no connection with appellant is evident from these facts; and no connection with the instant offense is established by the questions posed and the answers given.

According to argument by the prosecutor, Joe Dugas had been on death row for almost five years when the attempted escape occurred, and an investigation of the incident was continuing.

The questions and answers contained in the bill likewise do not show how they are relevant to impeach the testimony that Joe Dugas was incapable of acting alone.

A criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness. *Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Under the particular facts of this case, we find that the proposed questions and answers contained in the bill of exception reveal that this evidence was not even marginally relevant under the claims advanced by appellant. No abuse of the trial court's discretion has been shown. The twelfth, thirteenth and fourteenth points of error are overruled.

Appellant's fifteenth point of error asserts the trial court erred in denying appellant's requested charge number six as to whether Charles Neel was an accomplice witness as a matter of fact.

■ An accomplice witness is someone who participates with another before, during or after the commission of a crime. One who cannot be prosecuted for the offense with which the accused is charged is not an accomplice witness. *Brooks v. State,* 686 S.W.2d 952 (Tex.Crim.App.1985). It has been said that a witness is not an accomplice witness unless there is some evidence of an affirmative act on the part of the witness to assist in commission of the offense. In the absence of such an act, he cannot be an accomplice witness, even as a matter of fact. *See Kunkle v. State,* — S.W.2d —— No. 69,501 (Tex.Crim.App. —June 18, 1986) (not yet reported).

■ There is no evidence showing that Charles Neel participated in the commission of the offense. There is no evidence that he was present at or near the scene at the time the offense was committed. Although he had been asked by Dugas to assist in getting rid of Dugas' in-laws on a number of occasions, Neel testified that he told Dugas he would help him only to get Dugas to stop bothering him. He testified that when he was asked in the parking lot of the Rodair Club in May, he told Dugas he was not going to help him. Additionally, there is no evidence to show that Neel knew when or even if Dugas would commit this offense. There is no evidence of any act, on Neel's part to assist in the commission of the offense. Thus, he cannot be an accomplice witness even as a matter of fact. *See Kunkle, supra.*

When there is no evidence that the witness was an accomplice, the jury need not be charged concerning the law of accomplice witnesses. *Harris v. State,* 645 S.W. 2d 447 (Tex.Crim.App.1983). No error on the part of the trial court has been shown.

■ In the sixteenth point of error, appellant claims the trial court erred in not ordering the State to disclose certain letters to appellant in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

After the State rested at the guilt-innocence phase and prior to any defense testimony, appellant requested the court to act upon her motion to examine the State's file for any exculpatory evidence that might be contained therein. The court inquired of the State. The State responded that it would like for the court to examine some letters and make a determination of whether or not these letters should be tendered to the defense. Other than the letters, the State responded there was nothing. The court ruled, that except for the letters, it would not examine the entire file. Subsequently, the court examined the letters and announced he had found nothing in them that might be discoverable by appellant. The court granted appellant's request that the letters be sealed and made a part of the

record transmitted to the appellate court, and the letters are contained in the record before us.

The *Brady* rule only requires a prosecutor to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

We have examined the letters in question and find no material evidence favorable to the appellant which was required to be disclosed. *See Castro v. State*, 562 S.W.2d 252 (Tex.Crim.App.1978).

■ In his seventeenth point of error, appellant asserts the trial court erred in denying his motion for mistrial after the prosecutor informed the jury panel during voir dire, that appellant had sought a change of venue.

Prior to the State's comments to the panel, the trial court told the prospective jurors that a change of venue to Bexar County had been ordered.

After this statement by the court the following occurred:

> MR. HUGHES [the prosecutor]: Judge Gist has done a very adequate job of explaining this change of venue. Sometimes defendants when they are facing a criminal case, they get into a situation where they don't believe they can get a fair trial. They believe there is too much prejudice in the community against them, they sometimes ask for venue change and ask to try the case—
>
> MR. CARVER: I'm going to object to going into any matters not necessary and not proper for voir dire.
>
> THE COURT: Objection overruled, if that's your objection.
>
> Go ahead.
>
> MR. HUGHES: Sometimes they feel like that the community where they reside is against them for various and sundry reasons, that there's an amount of

prejudice built up against them. When they will do is to go to another community. This is the case in this particular situation.

> MR. CARVER: Your Honor, I object again. It's not proper for the State to advise the jury who has filed for the change of venue or the grounds for it.
>
> THE COURT: Sustained.
>
> MR. CARVER: I would ask that the Assistant DA be instructed to refrain from making such comments in the future.
>
> THE COURT: Request granted.
>
> Mr. Hughes.
>
> MR. HUGHES: Ladies and Gentlemen,—
>
> MR. CARVER: May I continue my—
>
> THE COURT: I'm sorry.
>
> MR. CARVER: At this time, we would ask the Court to instruct the jury panel to disregard the comments and move for mistrial.
>
> THE COURT: The jury is so instructed. Request for mistrial is denied.
>
> May I interrupt you one moment, Mr. Hughes? I apologize.
>
> MR. HUGHES: Yes, sir.
>
> THE COURT: Ladies and Gentlemen, it's not unusual in any criminal case for there to be objections and other things being raised by the lawyers. It is even more common in a capital case, as I'm sure you understand. It's important that each of you understand that nothing that I say during the course of this proceeding nor anything said by any of the lawyers is evidence. Please do not let anything that you hear any of us say play a part in any decision that you may reach in the case.
>
> Go Ahead, Mr. Hughes.
>
> MR. HUGHES: Thank you, Your Honor. I guess, in essence, what I'm saying, members of the jury panel, is that we come here in a way in a sense as strangers within your gates. All we are asking for you to do is give us the same fair trial—the people of Jefferson County, of Bexar County, and the State of Texas—the same fair trial

that we know that you will give to the criminal defendant, Linda May Burnett.

No further mention of the change of venue was made by the prosecutor during his remaining remarks to the panel.

The jury panel was aware that the case had been moved to Bexar County on a change of venue from the remarks of the trial court. The prosecutor explained in general terms the basic rationale for a change of venue and asked the panel to give the State the same fair trial as they would give appellant. The complete context of the remarks reveals no error. *Cf. Mendoza v. State*, 552 S.W.2d 444 (Tex. Crim.App.1977).

Appellant's argument that the trial court erred in denying her specially requested instruction defining the phrase "beyond a reasonable doubt" is without merit. The rule is well established that the term "reasonable doubt" should not be defined in a Texas criminal case. *Young v. State*, 648 S.W.2d 2, 3 (Tex.Crim.App.1983). The judgment is affirmed.